UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL EUGENE WYATT,<br>Petitioner,<br>v.<br>JOHN SUTTON,<br>Respondent. | Case No. 18-cv-06588-PJH<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND GRANTING CERTIFICATE OF APPEALABILITY**<br><br>Re: Dkt. No. 40 |

This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the writ should not be granted. Respondent filed an answer and lodged exhibits with the court and petitioner filed several responses that the court has reviewed. For the reasons set out below, the petition is denied.

**BACKGROUND**

A jury found petitioner guilty of first-degree murder. *People v. Wyatt*, No. A144872, 2018 WL 1633816, at *5 (Cal. Ct. App. April 5, 2018). Petitioner was sentenced to 56 years to life in prison. *Id.* The California Court of Appeal affirmed the conviction and the California Supreme Court denied review. *Id.*; Answer, Exs. J, L. Petitioner filed a habeas petition with the California Supreme Court, which denied review. Ex. M.

**STATEMENT OF FACTS**

The California Court of Appeal set forth the relevant facts:

> An information charged [petitioner] with the 2012 murder of James Nobles (Pen. Code, § 187) and alleged that he personally used a deadly weapon in the commission of the

offense (Pen. Code, § 12022, subd. (b)(1)). The information also alleged that [petitioner] had a prior serious felony conviction for his 1995 voluntary manslaughter of Titus Crowder in 1995 for purposes of Penal Code section 667, subdivisions (a) and (e).

A. Prosecution Case

On February 8, 2012, the Alameda County Sheriff's office received a report that a dead body had been discovered near the Bay Area Rapid Transit (BART) tracks in Hayward. Detective Joshua Armijo of the Alameda County Sheriff's Office responded to the scene and observed the body of an African–American male at the bottom of a dirt embankment, near the support pillar of the elevated BART tracks. The body and clothing were relatively clean, leading Armijo to conclude that the victim had been killed elsewhere. The victim had two incised puncture wounds on his left chest, a swollen area on his left temple, a blackened eye, jawline swelling, and blood from his nostrils.

1. Investigation

The police did not find identification or personal effects on the body, but used fingerprints to identify the victim as James Nobles. Officers contacted Nobles's cousin, Ioma Nobles. She told them that Nobles had been living with "Mike" in Hayward. Although she did not have the exact address, she gave officers Mike's telephone number, which she would call if she wanted to reach Nobles. Police traced the phone number to [petitioner], who lived on Hampton Road, approximately a quarter-mile from where Nobles's body was discovered. They also determined this to be Nobles's last known address.

Police obtained a warrant to search [petitioner's]'s apartment on February 10, 2012. Officers executing the warrant observed blood drops inside the doorway and bloodstains on a mattress. Forensic evidence specialists found trace amounts of blood throughout the apartment. The search lasted approximately 12 hours until the morning of February 11; [petitioner] was not there.

2. Forensic Pathologist

Dr. Thomas Rogers conducted an autopsy on Nobles's body. He observed several blunt force injuries, including a bruise to the right eye, a laceration on the right side of the nose, and a bruise on the right arm. There were superficial incised wounds on Nobles's face, neck, and lower right leg, as well as six deeper stab wounds—two in the chest, one in the neck, one near the jawline, and two in the leg—that had been inflicted recently. The two chest wounds penetrated his left lung and caused life-threatening injuries. Dr. Rogers opined that multiple stab wounds and incised wounds were the cause of Nobles's death.

### 3. Ioma's Testimony

Ioma testified that Nobles was mentally disabled and could be "slow" and "childish." He took medications to control his symptoms, but had trouble remembering to take them. When he did not take his medication, he would behave oddly and mumble things that did not make sense. Even then, however, Nobles was not violent, and Ioma had never seen him behave aggressively or assault anyone.

### 4. [Petitioner's] Confession

[Petitioner] surrendered to police on February 12, 2012. His shoes and pants had apparent bloodstains. He waived his Miranda rights and agreed to be interviewed by Detective Armijo and Alameda County Sheriff's Sergeant Dave Dixon. (*See Miranda v. Arizona* (1966) 384 U.S. 436.) A redacted recording of the interview was played for the jury.

[Petitioner] told the officers that he was self-employed and took care of people in their homes. Years earlier he became friends with Nobles, who moved in with him in mid-2010. Nobles usually used his disability checks to pay the rent on the apartment. [Petitioner] denied they had any romantic involvement, but acknowledged that Nobles may have been interested in one.

[Petitioner] generally did not have any conflict with Nobles. However, sometimes Nobles would "go off the deep end" and talk to himself, behave in a childlike manner, and at times urinate on himself. [Petitioner] would let him act out, and Nobles would come back around. Most of the time, "[Nobles] was a gentle, easy-goin' guy regardless of what the circumstances," "he would not harm a fly," and he was "never a threatening person."

[Petitioner] claimed he did not know Nobles's whereabouts and had not done anything to him. After police said they could prove that Nobles was killed in [petitioner's] apartment, however, [petitioner] admitted to killing Nobles during a fight. He claimed that Nobles "flipped out," [petitioner] tried to subdue him, and "the next thing you know, it just got outa hand and I lost it."

[Petitioner] recounted the events as follows. Two weeks before the homicide, Nobles started acting out consistently. Nobles acted out so much—every day with constant movement or incessant babbling—that [petitioner] asked him to move to a board and care home. Nobles did so for a while, but [petitioner] let him return to the apartment.

Around 2:00 a.m. on Sunday, February 5, 2012, [petitioner] received a text from a male friend. Nobles knew it was from a man, and he became upset. Nobles started breathing hard and was constantly moving, making noises, and "acting real bad." [Petitioner] asked Nobles to "chill out," to no avail. [Petitioner]

3

repeatedly asked him to "just take it easy" and lie down, but Nobles did not stop. [Petitioner] told Nobles it would be best for him to leave at the end of the month, "[b]ecause this is gettin' outa hand here . . . [a]nd you constantly makin' it uncomfortable where I'm livin' at." Nobles "rant[ed] and rave[d]." [Petitioner] was unable to sleep during Nobles's disruption, which continued until around 6:00 a.m. on Sunday.

[Petitioner] awoke around 9:00 a.m. on Sunday. Nobles also awoke and was fine for a while, but then restarted his barrage of noise and movement. [Petitioner] repeatedly asked Nobles to calm down, but Nobles didn't relent, which "got [petitioner's] nerves in a frenzy."

[Petitioner] described Nobles's behavior as "nagging," explaining it as follows: "Words, there was a lot of movements . . . constant—he would get up and then he would write on the floor and then he would kick. It was just a lot of—I—I mean it may seem petty. You know, but it was just a lot of irritation. Just—just talking and you know and just moving around. . . . It just didn't—it just didn't let up."

Around 2:00 or 2:30 that afternoon, thing s "came to boil." [Petitioner] was watching basketball on television. Nobles "started actin' crazy," and [petitioner] asked for quiet. Nobles continued with his "madness" and "just kept on goin' and kept on and just kept on goin."

[Petitioner] duct-taped Nobles's hands together, duct-taped his ankles, and put duct-tape over his mouth. He also put Nobles in a corner and placed a mattress over him. Nobles broke free, untaping his hands and mouth. [Petitioner] unwrapped his ankles, but Nobles "started back at his theatrics again." [Petitioner] told Nobles it was best for him to "leave next month," but Nobles said he did not want to. Nobles's nagging persisted. [Petitioner] grabbed him by the shoulders and shook him; Nobles flailed around, "'doin' his little strikin' and, you know, kickin,'" and refused to "act like a civilized person." In [petitioner's] words, "it was just a naggin' thing" and "it was just pressin' me and then it blew me up." [Petitioner] grabbed a container of clear blue cleaning liquid and threw the liquid in Nobles's face. Nobles swallowed some of it, and it began to run out of his nose.

Nobles "seemed like he was just [losin'] it." Nobles kicked and slapped at [petitioner]—which [petitioner] agreed was Nobles defending himself—and [petitioner] punched Nobles in the chin. Nobles came at [petitioner] again, and [petitioner] punched him in the right eye. Nobles "went to the bathroom" and then "jumped and [ ] attacked again." Nobles had no weapon, but he was "tryin' to swing and tryin' to grab." [Petitioner] claimed that Nobles "flipped out" and it "scared" him, although he acknowledged that Nobles never threatened him or approached him in a threatening manner.

[Petitioner] grabbed a small "folding-knife" and, in "panic" and

4

"rage," stabbed Nobles twice in the chest. [Petitioner] heard a "poof" as the air exited Nobles's lungs. Nobles fell down, voided his bowels and bladder, and stopped moving. [Petitioner] believed Nobles was dead; he attempted chest compressions, but he did not consider calling 911. [Petitioner] knew, however, that he was in the wrong.

Confronted with the fact that Nobles had six stab wounds rather than two, [petitioner] initially maintained he stabbed Nobles only twice, but eventually agreed he had reached a boiling point and might not have realized all that he did. He acknowledged that a "few times in the past" he had become so angry that he did not remember what he was doing.

Roughly 12 hours after he killed Nobles, [petitioner] put Nobles's corpse into one of the apartment building's garbage cans and wheeled it over to the BART tracks, where he dumped it around 3:00 a.m. He also burned some clothing and household items to get rid of the evidence, and threw the knife down a gutter near the apartment. The next day, [petitioner] left the apartment and did not return until the search warrant had been executed.

[Petitioner] admitted to the officers that he "went too far" and stated repeatedly that Nobles did not deserve what happened to him. When asked if he premeditated the homicide, [petitioner] responded "No, no, no, I didn't."

Police later found the knife [petitioner] used to kill Nobles in the storm drain system, as [petitioner] had described. Police also found duct tape and the clear blue cleaning liquid in [petitioner's] apartment, as well as the garbage can used to transport Nobles's dead body.

5. Evidence of [petitioner's] Killing of Crowder in 1995

In 1995, the body of Titus Crowder, an African–American man who lived in an Oakland care home for men suffering from HIV, was found face down, bloody, and lifeless in his living room. Crowder was transported to a hospital and pronounced dead. Officers had recovered nine bullet casings near the body. They also found mail and other paperwork bearing [petitioner's] name, as well as photographs belonging to [petitioner] in a bedroom dresser drawer.

About three weeks after the homicide, [petitioner] was arrested and interviewed by David Politzer, at the time a sergeant with the Oakland Police Department. [Petitioner] told Politzer that he did not have a romantic relationship with Crowder but they were friends. They had not had previous arguments, but Crowder was "agitated" on the day he was killed.

[Petitioner] recounted that, on the day of the homicide, he and Crowder spent time together at a friend's home and then went to Crowder's apartment, where Crowder cooked dinner. After midnight, as [petitioner] got ready to leave, he asked Crowder

5

> about $200 that Crowder owed him. Crowder became angry, hit [petitioner] in the jaw, and pulled out a gun and pointed it at [petitioner]. [Petitioner] wrestled the gun away from Crowder, aimed it at him, and fired until the gun was out of bullets. [Petitioner] fled with the gun, walking from Crowder's apartment near Oakland's Lake Merritt to a friend's house in Emeryville. [Petitioner] threw the gun off of his friend's balcony, where it was later discovered.
>
> [Petitioner] pled guilty to voluntary manslaughter and served 10 years in prison for killing Crowder.
>
> B. Defense Evidence
>
> Defense investigator Kingston Farady testified that he interviewed Ioma, who told him Nobles was a kind, gentle, and humble person, but he was also a "fighter" who "wouldn't take crap from anyone" and she had seen him become angry and aggressive. In her testimony at trial, however, Ioma denied making such statements.
>
> Dr. David Howard, a forensic psychologist, opined that Nobles suffered from schizophrenia. He explained that schizophrenics can display aggression and hostility and frequently suffer from delusions, hallucinations, and speech disorders. They are more likely than an average person to be violent and to be the victim of violence. Although medications can be used to treat the symptoms of schizophrenia, the symptoms can reoccur if the patient stops taking the medications.
>
> Dr. Howard noted that Nobles had numerous involuntary psychiatric holds and hospitalizations due to his symptoms. According to medical records, when Nobles stopped taking his medication, he would hear voices, his speech and behavior would become disordered, and he would exhibit paranoid delusions, inappropriate affect, fragmented thought processes, impaired speech, and disturbed sleep. After reviewing a transcript of [petitoner's] interview, Dr. Howard found the descriptions of Nobles's behavior—constant words, writing on the floor, kicking, moving around, and saying nonsensical things—consistent with psychosis.
>
> The parties stipulated that Nobles had been convicted of misdemeanor battery in 2002, based on his assault of a hospital admitting clerk.

*Wyatt*, 2018 WL 1633816, at *1-5.

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *see Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *see Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *See Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

The state court decision to which § 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005). When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion. *See Nunnemaker* at 801-06; *Shackleford v. Hubbard*, 234 F.3d 1072,

7

1079 n.2 (9th Cir. 2000). The court looks to the California Court of Appeal opinion for claims one and two.

The standard of review under AEDPA is somewhat different where the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim. In such a case, as with claim three, a review of the record is the only means of deciding whether the state court's decision was objectively reasonable. *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000). When confronted with such a decision, a federal court should conduct an independent review of the record to determine whether the state court's decision was an objectively unreasonable application of clearly established federal law. *Himes*, 336 F.3d at 853; *Delgado*, 223 F.3d at 982.

## DISCUSSION

As grounds for federal habeas relief, petitioner asserts that: (1) the trial court erred by failing to instruct the jury on self-defense and imperfect self-defense; (2) there was insufficient evidence of premeditation and deliberation for first-degree murder; and (3) trial counsel was ineffective for failing to object to jury instructions and failing to present a claim of self-defense.

### I. SELF-DEFENSE

Petitioner first argues that the trial court erred by refusing to give jury instructions regarding self-defense and imperfect self-defense.

**BACKGROUND**

The California Court of Appeal set forth the relevant background:

> Defense counsel asked the trial court to instruct the jury with CALCRIM No. 505 (self-defense) and CALCRIM No. 571 (unreasonable or imperfect self-defense). Relying on testimony from Dr. Howard that Nobles [the victim] was suffering a psychotic break, and on [petitioner's] statement to police that Nobles "snapped," defense counsel argued that [petitioner] acted in self-defense because he reasonably believed he was in imminent danger. Counsel also argued that [petitioner] acted in unreasonable self-defense because his statement to police demonstrated that he was in actual fear, even if such a fear was unreasonable.

8

> The trial court declined to give the requested instructions, observing that [petitioner] had not indicated in his statement to police that he actually believed Nobles posed a danger to him. [Petitioner] contends the court erred.

*Wyatt*, 2018 WL 1633816, at *11-12.

**LEGAL STANDARD**

A state trial court's refusal to give an instruction does not alone raise a ground cognizable in federal habeas corpus proceedings. *See Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988). The error must so infect the trial that the defendant was deprived of the fair trial guaranteed by the Fourteenth Amendment. *See id.*

Due process requires that "'criminal defendants be afforded a meaningful opportunity to present a complete defense.'" *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). Therefore, a criminal defendant is entitled to adequate instructions on the defense theory of the case. *See Conde v. Henry*, 198 F.3d 734, 739 (9th Cir. 2000) (error to deny defendant's request for instruction on simple kidnaping where such instruction was supported by the evidence).

Due process does not require that an instruction be given unless the evidence supports it. *See Hopper v. Evans*, 456 U.S. 605, 611 (1982); *Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005). The defendant is not entitled to have jury instructions raised in his or her precise terms where the given instructions adequately embody the defense theory. *United States v. Del Muro*, 87 F.3d 1078, 1081 (9th Cir. 1996).

Whether a constitutional violation has occurred will depend upon the evidence in the case and the overall instructions given to the jury. *See Duckett v. Godinez, 67 F.3d 734, 745 (9th Cir. 1995).* An examination of the record is required to see precisely what was given and what was refused and whether the given instructions adequately embodied the defendant's theory. *See United States v. Tsinnijinnie*, 601 F.2d 1035, 1040 (9th Cir. 1979). In other words, it allows a determination of whether what was given was so prejudicial as to infect the entire trial and so deny due process. *See id.*

The omission of an instruction is less likely to be prejudicial than a misstatement of

9

the law. *See Walker v. Endell*, 850 F.2d 470, 475-76 (9th Cir. 1988) (citing *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977)). Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an "'especially heavy burden.'" *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (quoting *Henderson*, 431 U.S. at 155). The significance of the omission of such an instruction may be evaluated by comparison with the instructions that were given. *Murtishaw v. Woodford*, 255 F.3d 926, 971 (9th Cir. 2001) (quoting *Henderson*, 431 U.S. at 156).

**ANALYSIS**

The California Court of Appeal set forth the relevant state law and denied this claim:

> No evidence supported [petitioner's] claim of self-defense, because there was no evidence that any belief he had of being in danger of imminent harm was reasonable. Nobles [the victim] did not have a weapon, and although he approached in a "rage," he was merely "doin' his little strikin' and you know, kickin'," and "tryin' to swing and tryin' to grab." There was no evidence of any significant force in Nobles's attempted blows, or any reasonable basis for believing that Nobles was about to cause [petitioner] great bodily injury.
>
> Furthermore, no evidence supported [petitioner's] claim of self-defense or imperfect self-defense, because there was no evidence that [petitioner's] had any actual belief, reasonable or not, that he was in danger of imminent harm. [Petitioner] repeatedly told officers that Nobles did not have a weapon and that Nobles had not threatened him. Although [petitioner] claimed he "felt threatened" at the particular moment when Nobles "snapped," there was no evidence that [petitioner] believed he was in imminent threat of death or great bodily injury. To the contrary, when asked "what about his behavior" of Nobles made him feel threatened, [petitioner] said that Nobles was "unstoppable" in his "*noise, talking and rambling and . . . writing on the floor.*" (Italics added.) [Petitioner] insisted that Nobles never approached him in a threatening manner, never threatened him verbally, and "was never a threatening person."
>
> Finally, [petitioner] was not entitled to an instruction on self-defense or imperfect self-defense because he was the initial aggressor in the fight. (*In re Christian S.* (1994) 7 Cal. 4th 768, 773 fn. 1 [neither self-defense nor imperfect self-defense may be invoked by a defendant who by wrongful conduct such as initiation of a physical assault has created circumstances under which his adversary's attack is legally justified].) Although [petitioner] stabbed Nobles to death after Nobles approached

10

> him and kicked and slapped him, that occurred only after [petitioner] had bound Nobles with duct tape, taped over his mouth, put a mattress over him, and threw cleaning solution into his face. Indeed, [petitioner] agreed in his interview with police that Nobles's kicking and slapping, before [petitioner] punched him, was Nobles defending himself against [petitioner].
>
> [Petitioner] contends his acts of binding Nobles with duct tape and throwing a cleaning solution at him were lawful attempts to resist Nobles's misdemeanor offense of disturbing the peace. (*See* Pen. Code, § 415, subd. (2); § 693.) But Penal Code section 693 only allows "[r]esistance sufficient to prevent the offense." [Petitioner's] binding Nobles with duct tape, dousing him with a cleaning solution, and other acts were more than that.
>
> [Petitioner] also argues that he was not the initial aggressor because, before [petitioner] bound him with duct tape, Nobles had made noise for hours. But he provides no authority that Nobles's level of disruption made him the initial aggressor in their fight. In fact, [petitioner] characterized Nobles's behavior as "nagging" and conceded that others might consider it petty.

*Wyatt*, 2018 WL 1633816, at *12-13.

The state court's denial of this claim was not an unreasonable application of Supreme Court authority or an unreasonable determination of the facts. Petitioner has failed to demonstrate that the trial court's failure to give the jury instruction so infected the trial that he was denied a fair trial under the Fourteenth Amendment.

While petitioner is entitled to jury instruction for his theory of the case, the evidence in the case must support the theory. *See Conde* at 734; *Hopper* at 605. As set forth in detail by the California Court of Appeal, there was no evidence to support a jury instruction of self-defense or unreasonable self-defense. According to petitioner's statement to law enforcement, the victim had no weapon and had not threatened petitioner. Petitioner further told law enforcement that the victim had been making noise, rambling and writhing on the floor and that it was only after petitioner had bound the victim with duct tape, taped over his mouth, put a mattress over him, and threw a cleaning solution onto his face that the victim approached petitioner to kick and slap him. The state court found that petitioner was the initial aggressor and, looking at all the evidence determined that he was not entitled to a self-defense instruction under state

law. Petitioner had even conceded to law enforcement that the victim was defending himself at that time. The denial of this claim by the state court was not unreasonable.

Even assuming the trial court erred by failing to give the instructions, any error was harmless and did not have a "substantial and injurious effect or influence in determining the jury's verdict." *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). For the same reasons as set forth above, there was overwhelming evidence of petitioner's guilt and that the victim was not a threat to him. Petitioner has failed to show the state court opinion was objectively unreasonable. This claim is denied.

## II. SUFFICIENCY OF THE EVIDENCE

Petitioner contends that there was insufficient evidence to find premeditation and deliberation to support first-degree murder.

### BACKGROUND

Pursuant to state law, three kinds of evidence are used to determine whether premeditation and deliberation exist: preexisting motive, planning activity and manner of killing. *People v. Brady*, 50 Cal. 4th 547, 561-62 (2010). These factors "are merely a framework for appellate review; they need not be present in some special combination or afforded special weight, nor are they exhaustive." *Id*. In this case, the California Court of Appeal noted there was no evidence of planning activity. *Wyatt*, at *5. The state court then set forth the evidence that did support premeditation and deliberation:

> 1. Preexisting Motive
>
> In his confession to police, [petitioner] explained that he killed Nobles after hours of Nobles moving, making noise, babbling incoherently, acting out, and failing to cease this activity no matter how many times [petitioner] asked. Despite [petitioner] duct-taping Nobles's mouth, hands and ankles, throwing cleaning liquid in his face, telling him to move out, grabbing him by the shoulders and shaking him, and punching him twice in the face, Nobles's "nagging" appeared unstoppable. From this evidence, the jury could reasonably conclude that Nobles had become so annoying to [petitioner], and [petitioner's] efforts to quiet him and convince him to stop or move out had proven so fruitless, that [petitioner] decided he had to kill Nobles in order to get him to stop.
>
> [Petitioner] acknowledges that Nobles's conduct gave

12

[petitioner] a reason to try to make Nobles stop his behavior, but he argues it was not a motive for [petitioner] to actually kill him. Whether it was reasonable for [petitioner] to want to kill Nobles under the circumstances is not the point, however; the point is that the evidence suggested that [petitioner] had determined in his own mind a reason to kill Nobles, even if it was not what most people would consider a good one.

2. Manner of Killing

Evidence indicating that a killing was carried out in a particular and exacting manner may, in combination usually with evidence of planning or motive, support a finding of premeditation and deliberation. (People v. Anderson (1968) 70 Cal.2d 15, 27.)

Here, [petitioner's] killing of Nobles was the culmination of an escalating, hours-long incident, in which [petitioner] had ample time for reflection before he inflicted the fatal stab wounds. After binding Nobles with duct tape, throwing cleaning liquid in his face, grabbing him by the shoulders, shaking him, and punching him to no avail, [petitioner] picked up the folding knife (it is unclear if he had to unfold it) and plunged the blade twice into Nobles's chest. [Petitioner] conceded that he might have lost count of how many times he really stabbed Nobles, and indeed, the coroner observed six recent stab wounds on Nobles's body. From the manner in which [petitioner] killed Nobles—multiple stab wounds to the chest—along with [petitioner's] motive for killing him, the jury could reasonably conclude that [petitioner] had weighed the considerations and decided to end Nobles's life. FN. 4

> FN. 4. Alternatively, the jury could have reasonably inferred that [petitioner] decided to kill Nobles when he continued his barrage of noise and movement as [petitioner] tried to watch the basketball game on Sunday afternoon, before duct-taping him; if so, [petitioner's] acts of duct-taping, throwing cleaning liquid in Nobles's face, and punching Nobles over a span of time could be viewed as acts of torture leading up to the fatal stabbing. Acts of torture may support a conclusion of premeditation and deliberation. (*See People v. Proctor* (1992) 4 Cal. 4th 499, 529–530.)

3. [Petitioner's] Actions after the Killing

After [petitioner] stabbed Nobles at least twice in the chest, he heard a "poof" of air exit Nobles's lungs and watched as Nobles collapsed and voided his bladder and bowels. He did not call 911, either for medical assistance or to summon the police. Instead, he waited in the apartment with Nobles's dead body for approximately 12 hours—until around 3:00 a.m. when he would less likely be seen by police or witnesses—and then wheeled the corpse in a garbage can to the BART tracks and dumped it. From this evidence, the jury could reasonably infer that [petitioner's] callousness toward Nobles's body reflected

13

> not only his state of mind after the stabbing, but his state of mind toward Nobles before and during the stabbing, consistent with his deliberative decision to end Nobles's life.
>
> Based on the evidence of motive, the manner of the killing, and [petitioner's] conduct after Nobles's death, there was substantial evidence that the murder of Nobles was perpetrated with premeditation and deliberation—even without consideration of the fact that [petitioner] had also killed Crowder in 1995, which we consider next.
>
> 4. 1995 Homicide
>
> The trial court admitted evidence of [petitioner's] 1995 homicide of Crowder under Evidence Code section 1101, subdivision (b) and the doctrine of chances, and subsequently instructed the jury that, if it found that [petitioner] committed this uncharged offense, "you may, but are not required to" consider the evidence for the limited purpose of deciding whether or not [petitioner] "acted with the *specific intent and/or mental state* required by the charged offense or any lesser offense" and whether [petitioner's] explanation for the killing of Nobles was true. (Italics added. *See People v. Steele* (2002) 27 Cal. 4th 1230, 1244 (*Steele*).) The court further instructed the jury to "consider the similarity or lack of similarity between the uncharged and the charged offense" in evaluating the evidence. From the proof that [petitioner] perpetrated the two homicides, it was permissible for the jury to infer that [petitioner's] killing of Nobles was intended and premeditated. (Ibid.)

*Wyatt*, 2018 WL 1633816, at *5-7 (footnote omitted).

**LEGAL STANDARD**

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, *see Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, *see id.* at 324.

The Supreme Court has emphasized that "*Jackson* claims face a high bar in federal habeas proceedings . . . ." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam) (finding that the 3rd Circuit "unduly impinged on the jury's role as factfinder" and failed to apply the deferential standard of *Jackson* when it engaged in "fine-grained

14

factual parsing" to find that the evidence was insufficient to support petitioner's conviction). A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992), *cert. denied*, 510 U.S. 843 (1993); *see, e.g., Coleman*, 566 U.S. at 656 ("the only question under *Jackson* is whether [the jury's finding of guilt] was so insupportable as to fall below the threshold of bare rationality"). The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Payne*, 982 F.2d at 338 (quoting *Jackson*, 443 U.S. at 319). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt has there been a due process violation. *Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d at 338.

**ANALYSIS**

The California Court of Appeal set forth the relevant state law and denied this claim:

> [Petitioner] insists that the evidence showed he did not act with premeditation and deliberation. In his view, he tried "low-level physical efforts to stop" Nobles's disruptions, which led to Nobles charging [petitioner] to kick and slap him; immediately before the homicide, Nobles "attacked again," "snapped" "in a rage," and was swinging his hands and trying to grab [petitioner]; and [petitioner] reacted in a state of "panic" and "rage" by grabbing the knife and stabbing Nobles twice, trying thereafter to revive him. But even if the evidence was reasonably subject to an inference that [petitioner] did not premeditate or deliberate, it was also reasonably subject to an inference that he did, choosing to end Nobles's nagging once and for all by stabbing him repeatedly in the chest until he was dead. It is not our role to reweigh the evidence or choose between permissible inferences; we merely determine whether there was substantial evidence to support the jury's verdict, and in this case there was.
>
> [Petitioner] told the police he did not premeditate the killing and claimed he acted "out of the heat of rage." The jury, however, did not have to believe [petitioner's] self-serving depictions of his mental state. To the contrary, the jury could have reasonably concluded that [petitioner's] use of a legalistic phrase such as "out of the heat of rage" was a disingenuous attempt to minimize his crime, and that [petitioner's] story was

15

> so similar to the one he gave police with respect to killing Crowder—a good relationship with his victim until the victim suddenly lashed out—that he lied to police about his mental state in killing Nobles to obtain a deal based on a non-malice killing like he received with respect to Crowder. The jury heard the audiotape of [petitioner's] confession, and it was for the jury to determine the credibility of [petitioner's] assertions.
>
> [Petitioner] argues that, if the jury did not believe him, there was "no evidence of what happened" and therefore no evidence of first degree murder. Not so. The jury could have rejected [petitioner's] depiction of his state of mind, while accepting his depiction of what occurred to the extent it was consistent with the physical evidence. From the evidence of what occurred, the jury could reasonably conclude that, contrary to [petitioner's] claims, [petitioner] killed Nobles with deliberation and premeditation.
>
> [Petitioner] contends the jury should have believed him, because his account of the killing of Nobles was borne out by the evidence: his description of the punches he threw to Nobles's jaw and eye corresponded to Detective Armijo's observation of those injuries; his description of stabbing Nobles twice in the chest corresponded with Dr. Rogers's testimony that the fatal wounds were two stab wounds to the same area of the chest; and his description of Nobles's disruptive behavior was consistent with Dr. Howard's testimony of the symptoms Nobles exhibited as a schizophrenic. But that's the point: the jury could have accepted [petitioner's] version of what happened to the extent consistent with other testimony, but concluded that these events and the other evidence demonstrated his premeditation and deliberation.
>
> [Petitioner] fails to establish that the evidence was insufficient for first degree murder.

*Wyatt*, 2018 WL 1633816, at *7-8 (footnote omitted)

Petitioner's argument that there was insufficient evidence to find premeditation and deliberation to support first-degree murder was rejected by the state court. To the extent petitioner argues that the state court was incorrect in its analysis of state law and premeditation and deliberation, he is not entitled to habeas relief. The *Jackson* standard must be applied with reference to the substantive elements of the criminal offense as defined by state law. *Jackson*, 443 U.S. at 324 n.16; *see*, *e.g.*, *Boyer v. Belleque*, 659 F.3d 957, 968 (9th Cir. 2011) (concluding it was not unreasonable, in light of Oregon case law, for Oregon court to conclude that a rational jury could find beyond a reasonable doubt that petitioner intended to kill his victim based on proof that he anally penetrated

16

several victims with knowledge that he could infect them with AIDS). The state court's ruling on the state law issue is binding on this court.

The "minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law," *Coleman*, 566 U.S. at 655, and petitioner has not shown that the state court was objectively unreasonable in finding sufficient evidence to support the conviction in light of the high bar for *Jackson* claims. While there was not overwhelming evidence of premeditation and deliberation to support first-degree murder, the state court decision finding that jurors could have concluded that the act was premeditated and deliberate was not objectively unreasonable. A review of the record supports the determination the state court made after considering evidence of a preexisting motive, the manner of the killing, the actions afterwards and the facts of the 1995 homicide.

Petitioner has failed to demonstrate that the state court decision was objectively unreasonable in light of the high bar for sufficiency of the evidence claims on habeas review. This court does not determine whether it is satisfied that there was sufficient evidence, only that viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements beyond a reasonable doubt. A review of the evidence demonstrates that jurors could have determined that there was premeditation and deliberation to support first-degree murder. The state court decision was not unreasonable, and therefore this claim is denied.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner argues that trial counsel was ineffective for failing to object to erroneous jury instructions and for failing to present a defense of self-defense.

**LEGAL STANDARD**

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness must be whether counsel's

17

conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id.*

In order to prevail on a Sixth Amendment ineffectiveness of trial counsel claim, petitioner must establish two things. First, he must establish that trial counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland*, 466 U.S. at 687-88. Second, he must establish that he was prejudiced by trial counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

**ANALYSIS**

This claim was summarily denied by the California Supreme Court. Answer, Ex. M. This court has conducted an independent review of the record to determine whether the state court's decision was an objectively unreasonable application of clearly established federal law. *Himes*, 336 F.3d at 853; *Delgado*, 223 F.3d at 982. Petitioner's argument on how counsel was ineffective is not exactly clear. In his petition to the California Supreme Court that he attached to this federal habeas petition, petitioner stated that counsel was ineffective because of improper jury instructions and for "let[ting] the prosecutor charge him with first-degree murder instead of manslaughter. Docket No. 19 at 9-10.

To the extent petitioner argues in this federal petition that counsel was ineffective for failing to argue self-defense and for failing to request jury instructions for self-defense and unreasonable self-defense, he is not entitled to relief. As discussed above, trial counsel did request jury instructions for self-defense and unreasonable self-defense, but the request was denied because there was no evidence to support giving these instructions. Petitioner's own statements to police, along with other evidence, contradicted any argument that could have been made for self-defense and provided

18

support for premeditation and deliberation. In addition to requesting jury instructions on self-defense and unreasonable self-defense, trial counsel tried to bolster a self-defense claim by obtaining an expert witness and presenting testimony to show that the victim was acting violently towards petitioner. *Wyatt*, 2018 WL 1633816, at *4-5. However, the jury did not credit these arguments and evidence. Petitioner does not describe what other actions counsel should have taken. Petitioner's conclusory allegations that counsel was ineffective with no support are insufficient to warrant habeas relief. *See Strickland*, 466 U.S. at 690 ("A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment.") The California Supreme Court's denial of this claim was not objectively unreasonable. The claim is denied.[1]

**APPEALABILITY**

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in the ruling. *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (effective December 1, 2009).

To obtain a COA, petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Section 2253(c)(3) requires a court granting a COA to indicate which issues satisfy the COA standard. Here, the court finds that the second claim regarding the sufficiency of the evidence meets the above standard and

---

[1] Petitioner has also attached a few pages from a hearing to replace his counsel pursuant to *People v. Marsden*, 2 Cal. 3d 118 (1970). Docket No. 19 at 13-15. This does not support his argument for ineffective assistance of counsel, and he has not presented or exhausted a separate claim that the trial court erred in denying the request to replace counsel.

19

accordingly GRANTS the COA solely for that claim.  *See generally Miller-El*, 537 U.S. at 327.

Accordingly, the clerk shall forward the file, including a copy of this order, to the Ninth Circuit Court of Appeals.  *See* Fed. R. App. P. 22(b); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997).

## CONCLUSION

1. The petition for writ of habeas corpus is **DENIED** on the merits.  A certificate of appealability is **GRANTED**.  *See* Rule11(a) of the Rules Governing Section 2254 Cases. Petitioner is cautioned that the court's ruling on the certificate of appealability does not relieve him of the obligation to file a timely notice of appeal if he wishes to appeal.

2. Petitioner's motion to enlarge (Docket No. 40) is **DENIED**.

3. The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: December 5, 2019

*/s/ Phyllis J. Hamilton*

PHYLLIS J. HAMILTON
United States District Judge